Good morning. May it please the Court, Darren Kaplan, the law firm of Chilwood Harley-Harness for the plaintiff, Johnson, in this case. Your Honor, we are, Your Honors, we are here on a grant of summary judgment by the District Court. The summary judgment was a decision which essentially served the function of a motion to dismiss. It was a decision that was largely based on a legal conclusion. And that conclusion appeared to be that the sale of a high-definition television as, quote, 1080p, despite the fact that that television cannot receive a 1080p signal from the only input that matters, the legal conclusion of the District Court was that that was not deceptive and did not give rise to any particular claim on the part of the plaintiff or on the part of the class that we sought to certify below. The allegations of the... Let me cut to the, I guess to the, perhaps one of the ultimate, let's assume we all, we agreed with you. At the end of the day, what measure of damages do you have? Your central assertion is that they're different between what you bargained for and what you received. But in those days, how much is that? I know we're in a trial, but what's your theory of damages? The theory of damages would be a regression analysis where an economist would take the price of the televisions the following year, which are also 1080p televisions or sold as 1080p televisions, that have the capability of the 1080p input. And you would then compare that with the price of the... Okay. Give me a ballpark of what you think you're going to be asking for. Your Honor, I think it's going to be about $600 to $1,000. Okay. And that is based on what we were able to do in a companion case in New Jersey. Okay. Go ahead with your argument. I just want to know where we're headed for this case at the end of the day. Well, I think that's where we're headed, Your Honor. I hope that's where we're headed. No, I mean, if you prevail and all. We aren't anywhere near that yet, but I just... Be sure. I couldn't tell from your brief how much we were really talking about in terms of your theory. That's right, Your Honor. And that raises one of the reasons why we hold that the court should have denied summary judgment. We didn't get any discovery from... How much did he pay for the television? $3,000 to $4,000, I think, is the range of these things. At that time, they're very large televisions. They're very expensive televisions. They're the top of the line. There's no dispute on our part that these are top-line televisions. I will concede that they give a great picture. I will concede that the colors are really vibrant and all the things that television manufacturers endlessly trumpet. But that's not what this case is about, Your Honor. This case is about a specific representation, a representation that is tiable to a standard that the industry itself agreed to be governed by. I didn't understand Mr. Johnson to say he understood the representation of a TV as being a 1080p to be what your expert said a 1080p is. I believe that's correct, Justice. Isn't that a pretty important point? Well... If he said, I thought I was getting a 1080p that would bring in a signal through the HDMI port, I'd have a lot more sympathy. But if he doesn't say that's what I was looking for, I understood a 1080p to be a 1080p display, which is the language you use throughout the case, I'm not sure I understand exactly what he didn't get that he thought he was going to get. Well, with all due respect, Judge Silverman, I don't believe he said that I was only going to get a 1080p display. What Mr. Johnson testified to was he wanted the 1080p technology package. That's what he was being told was the best package. He wanted 1080p because that technology was what was being touted at the time. And it is our position that the 1080p designation presupposes that you have some usable input that will give you a 1080p signal. Well, you do accept that there is no over-the-air 1080p transmission at this point, right? That's exactly right. And that was not a new thing that came up in 2005, Judge Vogel. That was something that had happened well prior to the sale of these televisions by Mitsubishi. Our expert is very clear on that, and he would know because he's the one that rolled out the HDTV standard for two of the networks. So does that answer your question? No, well, I'm just trying to make sure I understand the technical point. The TV actually does display 1080p, and if there were an over-the-air 1080p signal, which there may or may not be, at some point in the future it would receive that, correct? Yeah. For purposes of this motion, we will concede that the display is 1920 by 1080 in a progressive standard. There was some back and forth between the experts. My expert will tell you that due to the Cal factor, it's actually a little bit larger. And if you had a 1080p compact disc, or a DVD, rather, you could play that on the TV as well, couldn't you? If you had a 1080p compact disc? Would it play a Blu-ray? Yeah, Blu-ray. I'm sorry. I tripped over my words. If you had a DVD, if you had a Blu-ray DVD that was 1080p, the TV would play that. It would depend on the model of TV and the settings of the Blu-ray player. It's a very important question, Judge Vogel. I want to make sure I answer it. Okay. No, I'm sorry. Some Blu-ray players can be set to output less than 1080p. In that case, if they're hooked up through the HDMI input on this television, you can play it through the HDMI. It'll play. It just won't display. Well, if you set it to output at 1080p, you will get it blank. Exactly. Exactly. But if you set it to output at a lesser resolution, at 1080i or 720p, you'll get a picture. And if it's 720p, it'll upscale the 1080. And if it's 1080i, it'll de-interlace it and display it regressively. All right. The problem is that the HDMI input does not receive a 1080p signal. That is the problem with this particular television set. That is correct. And your argument is that Mitsubishi had a duty to affirmatively disclose that. That is most certainly my argument, because they sold the televisions as 1080p. It was incumbent upon them, because that is a standard, because it is not super-public or some loosey-goosey marketing term. It's a specific terminology that was adopted by all the broadcasters, all of the television manufacturers. Mitsubishi is a member of the advanced television system. The standard is that it necessarily includes the fact that the HDMI input offers that? Because it is hair-splitting, I suppose, but the TV does play 1080p inputs. If there were an over-the-air signal at 1080p, this TV would display it. Yes, it would, and the reason it would do that is because it's required to under the ATSC standard. The hardware is the issue. I beg your pardon? The hardware is the issue. It has difficulty taking a true 1080p signal from a Blu-ray disc or other disc because of the configuration of the hardware. That's what we're talking about here. The odd thing, though, is that your client really didn't care about that. Well, I have to disagree, Your Honor. He wanted 1080p technology. Yes, he wanted the technology, but, I mean, in terms of the satisfaction level of the TV and everything else, he seems to be pretty satisfied. You say he wanted the 1080p technology, but he didn't say, I wanted the 1080p input. It sounds like he wanted the 1080p display, and that's where, in the record, I find his gap. Well, I'm not sure that I agree with that, Judge Silverman. I think he was very specific about what he wanted when he hooked the television up. He had the Comcast guy come over. He was very dismayed to learn that Comcast wasn't broadcasting in 1080p. Okay, that's not Mr. Bishy's problem. That is correct. Okay, so what he wanted was a 1080p picture from Comcast. I'm trying to find the record where he says, I couldn't hook up a Blu-ray and get a 1080p signal, which is what I thought I was going to get. Where does he say that? He did not, so far as, it is not in the record. So far as I know, Mr. Johnson never attempted to connect a 1080p source with his television. Till later. I'm sorry? Till later. Till you came in. Well, I don't know whether he did or he didn't, but the fact remains that if he bought one now, he couldn't. He's got this television. I'm sure it's a great television, but it doesn't do what the defendant implicitly represented it would do when it sold the television as 1080p. And I'm very troubled by this idea, I guess, that somehow Mr. Johnson has to be the expert. No, he doesn't, but I think it gets down to the question you're talking about, fraudulent concealment and those types of issues. Generally, you have a consumer who bargains for X and was given Y. Here, it doesn't appear he really knew, with the level of nuance that you're describing, what he wanted and what he was buying and whether he was disappointed or not. Now, I don't think that goes to your warranty claims, but it may go to fraudulent concealment in a sense. It's possible. Well, however, as Your Honors are well aware, the law in California with regard to representations and reliance on representations made by remote manufacturers is a little bit looser than that. There's actually an objective standard for determining whether something is fraudulent, whether it's likely to mislead the reasonable consumer, the reasonable consumer test. And there's this whole list of factors that's set forth in the briefing about how the Court weighs that. And here, there's simply no argument that what Mitsubishi did was some – that they had some prevailing interest over just telling the truth to people. And we wouldn't be here if Mitsubishi had taken it upon themselves to simply put someplace on the television, not buried in 130-page manuals, someplace on the television or in the signage, on the package, something that said, hey, look, by the way, not all the inputs of this television are 1080p. And that might be a problem. Our allegations are that Mitsubishi knew it was going to be a problem because they were involved in developing Blu-ray and already knew that when Blu-ray came out, it would only be a 1080p transmission by HDMI, something which is apparently never even approached in Mitsubishi's responsive pleadings or in support of their motion. I think that at the end of the day, what I want this Court most to take from this case is that this is not a case about pie in the sky. When a manufacturer takes it upon themselves to sell a product as something specific, something, a capability that it already agreed what it was, it has an affirmative responsibility at least to disclose to the public all the limitations that are implicit in the terminology that it chose. And when it fails to do that, there's got to be a remedy for those people that purchase the television. So if they say this is a color TV, under your theory, they have to say it's also not 3D and it's also not a stereo and it's also not a computer? They have to disclaim all these other things? No, Judge Silverman, they don't. They only have to disclose 1080p because they chose to sell it as 1080p. If they had chosen to sell this television as a Mitsubishi waffle maker, then they would have had to disclose, I would argue, that it also, by the way, doesn't make waffles. But they chose something specific. That's the only thing that they're required to do. You're defining 1080p in a particular way because this television set actually is 1080p. Your Honor, I disagree. It has a 1080p display. But in order to make it a 1080p television, the ATSC, my expert, all of whom are unanimous in this idea that 1080p is not talking about display. No, but there is a 1080p input. And I realize it's hypothetical in the sense that there isn't an over-the-air 1080p signal. But this TV actually does or could receive 1080p signals. It just can't receive them through the HDMI port. This television could receive 1080p via the over-the-air input. However, there was not and apparently will never be any over-the-air transmissions of 1080p. I'm not missing your point. I'm trying to understand it from a legal standpoint. If you're talking about fraud, they don't tell you that there aren't any over-the-air 1080p signals. And they don't tell you that the 1080p signal doesn't go through the HDMI input. So those are the fraudulent omissions. Because you're saying a reasonable consumer would think when he or she was buying a 1080p television that it had an HDMI input, right? That's exactly right. Even though your client doesn't know HDMI from Adam, by his own testimony. I think that's right. You've got about a minute left. Do you want to reserve? I'd love to. Thank you very much. Thank you. Good morning, Your Honor. John Hussel on behalf of Mitsubishi Digital Electronics America, Inc. So why don't you get the guy a new TV? Why don't you get the guy a new TV? He never asks us for one, Your Honor. You know, I mean, really, I understand. I do take his point because he thought he was buying something and he hooks up his Blu-ray and it doesn't work. Unless he puts it at a lower resolution, he's going to be disappointed. Because he was buying, maybe he was buying the SkyCase in a sense he thought he was buying Sky, but now that he can connect up with it, he spent all his dough for it. It was interesting hearing the back and forth a little bit because it's not a situation where there was something wrong with this TV. None of the TVs that were sold back then could accept 1080p to the HDMI input. The technology just wasn't there. And you can ask Mr. Kaplan about that. He sued all the manufacturers. It wasn't like there was more 1080p technology that we weren't giving them. I think the only question was it was reasonably foreseeable then with Blu-ray coming on that there would be a 1080p input device going through the HDMI. But in 2005, Your Honor, the year that he bought his television, there wasn't the technology that would allow that to happen. So all the manufacturers were in the same boat. There wasn't a TV out there that they could accept the input in the way that he's asking. In the next year, there was. You're right. And he's saying you shouldn't have represented it to be ready for this when it wasn't ready for this technology. Well, actually, we represented it as 1080p. Which means what? 1080 lines of resolution, which he acknowledges it has. But it will never display. That's not in the record, Your Honor. There isn't anything in the record other than some counsel opining that the broadcasters aren't going to display in that format. Right. But, I mean, in 2005, it was essentially worthless. I mean, it was not going to display 1080p. But, Your Honor, it does display in 1080p. I'm glad that we're talking about this. Well, through upscaling and all that, yeah, I understand. But this is something that counsel acknowledges up here. This television displays in 1080p. It's the only resolution it can display in. So what we're talking about are the inputs. And we're talking about the signal that goes in. And there is, if you took a 1080p eye signal and a 1080p signal and you put them in the television and you were displaying them side by side, there would only be certain circumstances when you could actually see a difference between the two. Yes, but that's not what you're told on the television floor when you're buying a new TV. I mean, that's where it's kind of getting down to. I guess if I were in his shoes, I mean, just to play devil's advocate, and I bought this expensive TV for 3,000 or 4,000 bucks, and then I got a Blu-ray the next year and was told it couldn't display 1080p, I'd be a little irritated. I'd be very irritated. And you would say, well, you know, nobody could do it in 2005. But it wasn't 2003 or 2002. It was the next year that this stuff was available, and your clients manufactured some Blu-ray devices. So, you know, I understand his irritation, or his theoretical irritation. We don't know if he was really irritated or not. Well, that was another thing I thought was important to explain when I got up here. Mr. Kaplan explained that this was basically a motion to dismiss. It wasn't. It was not a motion to dismiss. We took plaintiff's deposition. Right. And we briefed everything based on the written discovery we received, and it was only later that a lot of these other things came up, including this expert's purported testimony. There isn't anything in that standard that says that you cannot use 1080p to describe a display, which is, I think, helpful for plaintiff's side of the case, because their class definition was based on a 1080p display. So if they can use it for their class definition, they really can't take us to task for using it to describe the TV, because that's how these TVs are described. It's the lens of resolution and it's a progressive display. I actually have an analogy. He says here, to summarize, 1080p has nothing to do with video displays. That was... I'm reading Hofner's declaration. That was Hofner's declaration. It wasn't the standard, Your Honor. The standard doesn't say that. Well, be that as it may, maybe you win a trial, but why doesn't this get them past summary judgment? Because the trial... We were entitled, Your Honor, to rely on the pleadings and on the discovery we received, and the pleadings and the discovery we received were based on a class of televisions that had a 1080p display. Why can't they amend their complaint? Well, they didn't try with the trial court, Your Honor, and that, I think, it had their bite at the apple. I mean, it wasn't just... We're not just relying on some minor part of a complaint. This is the class definition. And then we sent them written discovery and we asked them for all the facts that support all of the causes of action, and they never said, oh, by the way, there's no such thing as a 1080p display. As a general rule, can they amend their class definition if they want to? If they ask the court, the trial court, to amend their class definition, they could ask them if good cause appeared, the court could probably let them, but they can't do so in order to avoid summary judgment. We cited a case on that. But I think it's sort of like we were selling Michigan cherries and plaintiff decided he wanted Michigan cherries, and so these were cherries and they're grown in Michigan. And then he met a lawyer, and the lawyer said, you know what? When they mean Michigan cherries, they really mean these ones that are grown in these five counties. And then the guy gets mad because he thinks, oh, I wanted the really good Michigan cherries. And then they do a class action for all people who bought Michigan cherries except in these five counties. Yeah, but his counter would be that he bought Michigan cherries and they were manufactured in California and didn't tell him. That's not what happened here. I know, but I mean, that's the theory. Because based on what he thought, which is he wanted 1080p, and based on the class definition, he's displaying 1080p, and on pages 96 and 97 of the record, we asked him, did you buy this based on its ability to accept inputs? He said no. We asked him about six different questions on it. It had nothing to do with his decision to buy the television. He loves his television. He went to his school and he looked at the television and he said, that's the one. That's the picture. That's the picture he fell in love with. And he still likes his television. He still knows of no better one than he could have bought back then. And we actually also asked him, do you have any plans to buy any Blu-ray stuff? And he said no. But this is potentially just a warranty case, too, in which case if you had a sophisticated consumer in his shoes who said, once Blu-ray came out, I excitedly went down, I bought a player and I went down and plugged it in and I got a blank, and you told me last year I was buying 1080p, you know, that's a legitimate beef. But he wouldn't get a blank, Your Honor. He would get a screen based on a 1080i input. Right, exactly. It would be spectacular. And maybe, as we say, there are... You get a blank if you're trying to play 1080p. It's not going to display what... It's not going to... The display is not equal to the capability of the Blu-ray player. True? It would depend on what was going on with the display, Your Honor. Because, as I said before, in terms of the human eye being able to discern this... Well, the human eye is one thing. But if you're talking about technical specs, that's different. I mean, people often buy things... We all know in televisions that you can buy... You get sold on specs that probably are indiscernible, that nine out of ten people can't tell the difference. But that doesn't get you out of the warranty because that's what sells the... That doesn't get you specs because that's what sells televisions. If it's 240 megahertz versus 120 megahertz, we probably can't tell the difference in terms of action. But it sells. That's what people pay a premium for. And on that megahertz, Your Honor, there would be... You'd have to say to them, well, what did you mean by megahertz? Yeah. In this situation, when you say, what do you mean by 1080p, we've already explained it. It's the resolution. It's the lines of resolution and it's a progressive scan. That's what 1080p means. If we had made any representations about there being 1080p inputs or receiving native 1080p inputs or anything like that that was not true, then this would be a completely different case. But the description of 1080p fits this television. I mean, that's how all these televisions are sold, not just from Mitsubishi but all throughout the industry because it's lines of resolution. It's what kind of scan it has. And if there is some sort of hyper-technical video file sort of view on that, well, the information was out there, Your Honor. The information was out there. They could have talked to... Well, it was in the guide which is available on the Internet. They could have called Mitsubishi and asked them or they could have gone to any of the retailers and said, by the way, in terms of inputs, I'm really into this stuff. Well, it's not really into this stuff. I mean, you would expect it to display 1080p. It does, Your Honor. Well, no. Your Honor, this television, and this is in here, it's undisputed. This television can't display in any format other than that. No, I understand your point. I understand both the technical points, I think, even though I'm not articulating it well. But there is a difference. There is a difference. You're saying the difference doesn't matter. He says it does. That's where we are. I think you're saying that the technology wasn't yet there. I mean, if I understand you correctly. That's correct, Your Honor. When he says he wanted 1080p, this plaintiff, and then who is he talking about, this is as much 1080p as he could have gotten at the time. There isn't anything more he could have gotten. So there isn't anything. There isn't a bait and switch. There isn't. No, but often, I mean, I'm not saying it's this case, but often the pitch is in the store. Next year, you're going to have this, and you're going to want this, this feature, which does not exist now. You can't get it now. But next year, you're going to want to be, whether it's internet capable or whatever. I mean, that's a common pitch on a television store. They'll say, you buy for the future. Don't buy for the past. So, you know, it's a different plaintiff, but if you had a plaintiff saying, yeah, I want to be able to – I know Blu-ray is coming out. That's perhaps a different plaintiff, but it's a legitimate point for videophiles. Right. And because he's not a videophile, I don't think that makes any difference on the warranty. But, Your Honor, there wasn't any part of the warranty that – No, I mean the warranty theory. I'm talking in generic terms now. Okay. The sophistication or non-sophistication of the consumer makes no difference to a warranty theory. Right. That's the point I was trying to make. And, Your Honor, I think that's another thing that's important to point out here as well, is that there was a warranty claim pleaded, and there was a warranty claim responded to in discovery that was just related to the software. And we've briefed that fully, that there wasn't any breach of that, nor would that cover this situation, which is not a software situation at all. And, you know, again, there was another situation where had plaintiffs amended in the trial court, then, you know, he could have fairly asked us to, when briefing our motions, to dive into that in a different way. But they didn't, Your Honor. And we were entitled to summary judgment on the warranty claim that was, you know, before the trial court. Any further questions? I think we have your argument in hand. So thank you for being here. Thank you, counsel. Thank you. I'll be very brief. We've had no discussion yet about the Dade case. That was the case in the Eastern District of Michigan, where Judge Borman was looking at a settlement in a case against Sony. Same allegations. Sony sold 1080p televisions. They displayed it, quote, 1080p, but they didn't accept 1080p via the HDMI input. Judge Borman looked at those TVs. We had a full day mini-trial on that. Witnesses demonstratively exhibits the whole gamut. Judge Borman viewed those televisions and was able to immediately determine that there was a significant difference, even to his eyes, of a 1080p television that accepted a 1080p signal natively, that's the terminology, and a 1080p television that accepted a 1080i signal and deinterlaced it. He could tell the difference. Everybody there could tell the difference. He also made some specific findings of fact after hearing from Sony's own experts. What he found was the ATSC standard was the only thing that mattered and that the 1080p and the ATSC standard referred only to signals, not to displays. He also found that the ATSC standard specifically cautions manufacturers to provide for 1080p inputs. So in one court, we have summary judgment on that issue. In other words, the court in the district court below finds there's no material issue of fact on this. Roberts. Well, I don't know about the Michigan case. In this case, you alleged that 1080p is a display, and now you're saying it's not a display. So I asked Mr. Purcell, well, why can't they amend their complaint or amend their class definition? He said he never sought to do that. Let me ask you, did you? We did. There were two motions that were twinned up here. There was a motion for summary judgment and a motion to strike the class action allegations. That's a separate motion. In response to that motion, we opposed it by saying, hey, we finally have discovery from the defendant. Remember also, by the way, that we were very close in time here. This was not a case that had stretched out years of discovery. The defendants had given us their documents six days before they moved for summary judgment. One of the things that we were able to do in response to that was figure out the model numbers. So we said, look, Your Honor, we can define our class based on models, the models of television. And, in fact, this is not the first case that we've had. We were able to do that in the JVC case. We cite to it in our briefs. It's a matter of public record as to how the settlement notice defined the class. It's done by model. 1080p television in the class definition is a placeholder. And, by the way, it's not 1080p television. It's a television that has a 1080p display. Pardon me for not knowing this offhand, but did Judge Carney rule on the motion to strike the class? He did not. All right. So this moved based on the ruling on the summary judgment. That's correct. Thank you. So that's the class definition. And this idea that we already had a bite at the apple, we were just starting. There hadn't even been a Rule 26 disclosure yet in this case. I'm still not clear on your answer. Did you ask to have the complaint amended or the class amended? We sought in our motion, in our opposition to the motion, we asked the court to allow us to amend the class definition. And we provided the court with a new class definition. In the response to the motion to strike. Correct. Not the summary judgment motion. That's correct, Your Honor. And the motion for summary judgment, to the extent that the class definition is anything, it's routine. I don't have to tell anybody on this panel. It is routine on the motion for class certification to say this is the class we're seeking to certify. We don't need any special permission from the court to do that. It's not a formal amendment of the complaint. The allegations are the same. The question is what is going to be certified if the court grants the motion? What's the definition? And class definitions tend to be fairly amorphous, particularly if discovery is ongoing. The idea that, I'm sorry, you wanted to. No, no, go ahead. Well, I was going to say, we're talking about class definitions. I was going to say, so you want us to take on faith value, as a matter of faith, that your class representative who loves the picture, doesn't intend to connect a Blu-ray up to it, is your, is a representative of the class that you want to litigate, right? Who didn't, who can't tell the difference between the display? That's the representative of the class that we're litigating here? I guess there are two things that are sort of implicit in that question. Could he have told the difference in the display? The answer is, if you put the two displays in front of him, and given the right source material and the right circumstances, I'm certain that he could. Any lay person can tell the difference. With regard to this question of whether or not Mr. Johnson is an appropriate representative for the class as a whole, because he's a little bit. No, I'm not saying whether he's appropriate or not. He is your class representative. That's right. He is the class representative, and he is, in fact, an ideal class representative, because he doesn't have some form of specialized knowledge that would purportedly be required in order to certify a class. I don't think that class would be ascertainable. I think you have to assume that this test for whether this representation is misleading is an objective standard. If it is something that is based on the individual's own expectations, the class is uncertifiable. So in this particular case. No, certifiable if you have some Blu-ray user who felt disappointed in using the TV. He's not a Blu-ray user. He's not tried to use the technology that he claims he's missing. Well, that's. At least according to the record. So that's your class representative. That is our class representative. Okay. Thank you. Thank you, gentlemen. Thank you very much. Thank you. Thank you both for your arguments. And with that, we'll be in recess for the morning. All rise for Senate recess.
judges: Fogel, Thomas, Silverman